## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 24-14869 TBM |
| MELPO BELEGRATIS, | |
| | Chapter 13 |
| Debtors. | |

**MEMORANDUM OPINION AND ORDER ON: (1) DEBTOR'S HOMESTEAD EXEMPTION CLAIM; AND (2) MOTION TO AVOID JUDICIAL LIEN**

### I.      Introduction.

The Debtor, Melpo Belegratis (the "Debtor"), filed for protection under the Bankruptcy Code on August 21, 2024 (the "Petition Date").[1]  The Debtor asserted a $250,000.00 homestead exemption claim (as defined below, the "Homestead Exemption Claim") under Colorado law with respect to real property located 1119 Troy Street, Aurora, Colorado (the "Troy Street Property").  The Debtor has owned the Troy Street Property for a long time.  For years, she leased it out to earn income.  However, the Debtor claims that she and her son moved into the Troy Street Property and resided there for a ten-month period from early May 2024 until March 2025 — including on the Petition Date.

Three parties objected to the Debtor's Homestead Exemption Claim: (1) her former husband, Nector Nasious ("Mr. Nasious"); (2) her former legal counsel in her divorce case against Mr. Nasious, the Heckenbach Law Firm (the "Law Firm"); and the Chapter 13 Trustee (the "Trustee") (as defined below, the "Exemption Objections").  They all asserted that the Debtor's Homestead Exemption Claim should be rejected because: (1) the Debtor did not actually occupy the Troy Street Property on the Petition Date; and (2) even if she did technically occupy the Troy Street Property on the Petition Date, she did not do as "as a home," which is a requirement for a valid Colorado homestead exemption.

In addition to the homestead exemption issues, the Debtor also requested that the Law Firm's judicial lien for unpaid attorneys' fees stemming from the Debtor's divorce case be avoided under Section 522(f) (as defined below, the "Judicial Lien Motion").  The Law Firm objected (as defined below, the "Law Firm Response").

The Court conducted a trial on the foregoing disputes.  Most of the evidence centered on whether the Debtor occupied the Troy Street Property as a home on the Petition Date.  This seemingly simple factual issue was hotly contested.  At the conclusion

---

[1]      11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

of the trial, the Court took the foregoing disputes under advisement.  Now, for the reasons set forth below, the Court sustains the Debtor's Homestead Exemption Claim and grants the Judicial Lien Motion.

## II.      Jurisdiction and Venue.

Pursuant to 28 U.S.C. § 1334, this Court has subject matter jurisdiction to enter final orders on: (1) the Debtor's Homestead Exemption Claim and Exemption Objections; and (2) the Judicial Lien Motion and Law Firm's Objection.  The contested matters constitute core proceedings under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate); § 157(b)(2)(B) (allowance or disallowance of claims against the estate or exemptions); and § 157(b)(2)(O) (other proceedings affecting the liquidation of assets of the estate).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  No party contested the Court's jurisdiction or venue in the Court.

## III.      Procedural  Background.[2]

## A.      The Debtor's Bankruptcy Filing, Assets, Liabilities, and Homestead Exemption Claim.

The Debtor filed for protection under Chapter 7 of the Bankruptcy Code on the August 21, 2024 Petition Date.[3]  In her Voluntary Petition, she listed the Troy Street Property (1119 Troy Street, Aurora, Colorado) as the location "where you live"[4] (*i.e.*, her then-current residence).

The Debtor scheduled few assets.  She disclosed her ownership of the Troy Street Property, which she valued at $450,000.00.[5]  The balance of her other assets (cash, household goods and furnishings, electronics, exercise equipment, a firearm, and clothes) tallies to just $2,950.00.[6]  The Debtor also listed two co-owned apartments in Attica, Greece which she valued as "Unknown."[7]  The Debtor claimed C that all of her personal property was exempt.[8]  Central to the current dispute, the Debtor asserted a $250,000.00 homestead exemption in the Troy Street Property on her Schedule C (the "Homestead Exemption Claim").[9]

---

[2]      The Court will refer to documents from the CM/ECF docket for this bankruptcy case, *In re Belegratis*, Case No. 24-14869 TBM (Bankr. D. Colo.), using the convention: "Docket No. ___."

[3]      Tr. Ex. 1.  When referring to Exhibits admitted at trial, the Court uses the following designations: (1) "Tr. Ex. ___" refers to admitted exhibits introduced by the Trustee; (2) "Debtor Ex. ___" refers to admitted exhibits introduced by the Debtor; (3) "HL Ex. ___" refers to admitted exhibits introduced by the Law Firm; and (4) "NN Ex. ___" refers to admitted exhibits introduced by Mr. Nasious.

[4]      *Id.* at 2.

[5]      *Id.* at 19.

[6]      *Id.* at 20-26.

[7]      *Id.* at 18-19.

[8]      *Id.* at 27-28.

[9]      *Id.* at 27.

Regarding her secured debts, the Debtor identified two liens against the Troy Street Property: (1) a mortgage lien held by United Wholesale Mortgage in the amount of $290,513.47 (the "Mortgage Lien");[10] and (2) a judgment lien held by the Law Firm in the amount of $74,041.97 (the "Judicial Lien").[11]  With respect to unsecured debt, the Debtor listed 37 creditors holding an aggregate of $353,595.50 in general unsecured claims.[12]  The vast majority of the Debtor's unsecured debt is for credit cards.  She also identified some amounts owed for loans (including from family members), legal fees (from several different law firms), and medical charges.[13]

With respect to income, on her Statement of Financial Affairs (the "SOFA"), the Debtor noted only very modest historical income from "wages, commissions, bonuses, [and] tips" during the last several years: (1) $4,559.33 from January 1, 2024 to August 21, 2024; (2) $16,952.00 for 2023; and (3) $22,549.00 for 2022.[14]  Additionally, the Debtor disclosed receipt of "rental income" of: (1) $10,000.00 from January 1, 2024 to August 21, 2024; (2) $30,000.00 for 2023; and (3) $12,697.00 for 2022.[15]  On her Schedule I (which requires identification of income as of the Petition Date), the Debtor claimed to have only $68.00 in monthly income stemming from child support.

## B.   The Initial Exemption Objections, Judicial Lien Motion, and Conversion.

During the Chapter 7 phase of the Debtor's bankruptcy case, on February 28, 2025, Mr. Nasious submitted an "Objection to Debtor's Claims of Exemptions" objecting to the Debtor's Homestead Exemption Claim in the Troy Street Property (the "Initial Nasious Exemption Objection").[16]  The Debtor responded in opposition to the Initial Nasious Exemption Objection (the "Debtor's Initial Exemption Response").[17]

On April 7, 2025, the Debtor filed a "Motion to Avoid Judicial Lien" requesting that the Court avoid the Law Firm's Judicial Lien against the Troy Street Property pursuant to Section 522(f) (the "Judicial Lien Motion").[18]  The Law Firm responded in opposition to the Judicial Lien Motion (the "Law Firm Response").[19]

Meanwhile, the Debtor requested conversion from Chapter 7 liquidation to Chapter 13 reorganization.[20]  On June 13, 2025, the Court entered an "Order Granting Motion to Convert Case to Chapter 13."[21]  Since then, the Debtor's bankruptcy case has proceeded in Chapter 13.  The Debtor filed a proposed "Chapter 13 Plan Including Valuation of

---

[10]   *Id.* at 30.
[11]   *Id.* at 29.
[12]   *Id.* at 32-45.
[13]   *Id.*
[14]   *Id.* at 9.
[15]   *Id.*
[16]   Docket No. 52.
[17]   Docket No. 64.
[18]   Docket No. 68.
[19]   Docket No. 80.
[20]   Docket No. 74; NN. Ex. 8.
[21]   Docket No. 89.

Collateral and Classification of Claims" (the "Chapter 13 Plan").[22]  The Trustee and Mr. Nasious objected to the Chapter 13 Plan on myriad grounds.[23]  Among other things, the Chapter 13 Trustee and Mr. Nasious asserted that the Debtor's treatment of the Troy Street Property in the Chapter 13 Plan violated various parts of Section 1325 because the Troy Street Property is not exempt.  The Court has not confirmed the Debtor's Chapter 13 Plan and has not entered a discharge of the Debtor's debts.

**C.    The Renewed Exemption Objections and Responses.**

After the conversion to Chapter 13, on August 7, 2025, Mr. Nasious submitted a "Renewed Objection to the Debtor's Claim of Exemption"[24] followed shortly thereafter by a "Corrected and Renewed Objection to Debtor's Claim of Exemptions" (the "Final Nasious Exemption Objection").[25]  In the Final Nasious Exemption Objection, Mr. Nasious stated: "Nector Nasious renews and incorporates his Objection to the Debtor's Claim of Exemptions (Doc#52) filed February 28, 2025."[26]  Mr. Nasious did not present any arguments not already advanced in the Initial Nasious Exemption Objection.  Thus,  the Final Nasious Exemption Objection is Mr. Nasious' operative pleading contesting the Debtor's Homestead Exemption Claim.  The same day, the Chapter 13 Trustee entered the fray and filed his "Objection to Claim of Exemption" (the "Trustee Exemption Objection") objecting to the Debtor's Homestead Exemption Claim.[27]  Shortly thereafter, the Law Firm joined and presented its "Corrected Objection to Debtor's Claim of Homestead Exemption, 1117 Troy Street Denver, Colorado" (the "Law Firm Exemption Objection") also objecting to the Debtor's Homestead Exemption Claim.[28]  The Debtor responded in opposition to the Final Nasious Exemption Objection mainly by "reincorporate[ing] and realleg[ing]" the Debtor's Initial Exemption Response (the "Debtor's Response to Nasious Final Exemption Objection").[29]  And, the Debtor separately responded in opposition to the Trustee Exemption Objection and the Law Firm Exemption Objection.[30]

To clarify, the operative objections framing the dispute over the Homestead Exemption Claim are: (1) the Final Nasious Exemption Objection (which incorporates the Initial Nasious Exemption Objection); (2) the Trustee Exemption Objection; and (3) the Law Firm Exemption Objection.  The Court sometimes refers to the foregoing together as the "Exemption Objections."  The Debtor filed responses contesting all of the foregoing, including the Debtor's Response to Nasious Final Exemption Objection and separate responses to the Trustee Exemption Objection and the Law Firm Exemption Objection. The Court sometimes refers to all of the Debtor's responses opposing the Exemption Objections as the "Debtor's Exemption Responses."

---

[22]    Docket No. 94.
[23]    Docket Nos. 102 and 103.
[24]    Docket No. 107.
[25]    Docket No. 115.
[26]    *Id*. at 2.
[27]    Docket No. 108.
[28]    Docket No. 123.
[29]    Docket No. 130.
[30]    Docket Nos. 128 and 129.

**D.    The Trial.**

Faced with an avalanche of litigation concerning the Homestead Exemption Claim, the Exemption Objections, the Debtor's Exemption Responses, the Chapter 13 Plan, objections to the Chapter 13 Plan, the Judicial Lien Motion, the Law Firm Response, and numerous other contested motions and objections, the Court, as a matter of efficiency and economy, elected to conduct an initial combined trial (the "Combined Trial") on the: Homestead Exemption Claim; Exemption Objections; Debtor's Exemption Responses; Judicial Lien Motion; and Law Firm Response.[31]  The Court also deferred adjudication of all the other pending disputes until after the outcome of the Combined Trial.

After additional discovery, the Debtor and Mr. Nasious submitted Trial Briefs.[32] The Court conducted the Combined Trial on December 10, 2025.[33]  During the Combined Trial, the Court heard Opening Statements from all the parties and then received testimony from four witnesses: Mr. Nasious; Terrell Yiannikis; the Debtor; and Louie Belegratis.  At the request of Mr. Nasious' counsel, the witnesses (other than the Debtor and Mr. Nasious) were sequestered pursuant to F.R.E. 615(a).  The Court also admitted into evidence voluminous exhibits:  (1) Mr. Nasious' Exhibits 8, 30, 36 (in part), 41, 42, 47, 49-59, 61-63; and 71; (2) Trustee's Exhibits 1, 8, 13, and 16; (3) Debtor's Exhibits B and E-G; and (4) Law Firm's Exhibits 2 and 5-7.[34]  At the conclusion of the presentation of evidence, the Court entertained fulsome Closing Arguments from all of the parties. Thereafter, the Court took the disputes under advisement.  Since then, the Court has considered the testimony of all of the witnesses, reviewed all of the admitted exhibits, and assessed the applicable law.

## IV.    Factual Findings.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c),[35] based upon the admissible evidence presented at the trial (including both testimony and exhibits).  To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

---

[31]    Docket No. 145.

[32]    Docket Nos. 165 and 166.  Mr. Nasious and the Law Firm also submitted a "Stipulation of Undisputed Facts" (the "Facts Stipulation").  (Docket No. 163.)  However, the Debtor did not agree to the Facts Stipulation.  So, it is of no moment.

[33]    Docket No. 169.

[34]    *Id*.

[35]    This Order states "findings of fact specially and conclusions of law separately," as required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.  See *S.E.C. v. St. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized."  *Id.; see also Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004 at *3 (D. Colo. Mar. 31, 2022) (same).

A.    <u>**The Debtor and Her Purchase of the Troy Street Property**</u>.

The Debtor is a middle-aged woman.  She graduated from high school.  Afterward, she took some college courses but did not obtain an undergraduate college degree.  For most of her life, the Debtor has lived with her mother, Barbara Belegratis ("Mother"), at a home owned by her Mother located at: 5462 E. Tennessee Avenue, Denver, Colorado (the "Mother's Home").  The Debtor has been employed sporadically over the years.  On the Petition Date, she was unemployed (and supported by her mother).[36]  Post-bankruptcy, the Debtor secured a position as a dental assistant in a dental practice affiliated with one of her brothers.  She has limited training in the dental field; but, she had a prior job as a dental assistant and, by now, has gained some experience.

In 2008, while still living at her Mother's Home, the Debtor purchased the Troy Street Property for $85,000.00.  The Troy Street Property consists of a 1,988 square foot single-family home located in Aurora, Colorado.  It has four bedrooms and two bathrooms.  The backyard is large.  The Troy Street Property is in a high-crime neighborhood.  When the Debtor purchased the Troy Street Property it was in very poor condition.  The Debtor purchased the Troy Street Property to produce rental income in the short to medium term.  But, she anticipated eventually moving into the Troy Street Property.

In the meanwhile, the Debtor remodeled and upgraded the Troy Street Property over the years.  She invested about $150,000.00 making changes to: two bathrooms; the kitchen; flooring; lighting; windows; doors; and other parts of the Troy Street Property.  Between 2008 and 2024, the Debtor leased the Troy Street Property to various tenants to earn income.  She did not live there during such sixteen-year period; instead, she lived with her mother in her Mother's Home (except from March 2020 to January 2022 when she was married and lived next door to her Mother's Home).  Based on her familiarity with the Troy Street Property as well as her research conducted on Trulia, Zillow, Realtor.com, and Homes.com, the Debtor testified that the Troy Street Property currently is valued at $402,000.00, which is a decrease from its value on the Petition Date.  There was no contrary evidence, so, the Court finds that the Troy Street Property was worth $450,000.00 on the Petition Date but its value has dropped to $402,000.00 as of the date of the Combined Trial.

B.    <u>**The Debtor's Marriage and Divorce**</u>.

The Debtor and Mr. Nasious married on January 31, 2020 in Denver, Colorado.  Later, they solemnized their marriage in a Greek Orthodox religious ceremony, on August 29, 2020 in Kefalonia, Greece.[37]  In March 2020, the Debtor and her new husband took up residence at 5452 E. Tennessee Avenue, Denver, Colorado (the "Marital Residence"), which was located next-door to the Mother's Home.  Neither the Debtor nor her husband owned the Marital Residence.  Instead, during the marriage and afterward, the Debtor's

---

[36]    Tr. Ex. 1 at 48.

[37]    Debtor Ex. E at 2.

mother owned the Marital Residence.  The Debtor's marriage to Mr. Nasious was short-lived — the ensuing litigation has lasted longer than the marriage.

On January 15, 2022, less than two years after they were married, the Debtor filed a "Petition for Dissolution of Marriage With Children," initiating a divorce case in the District Court for the City and County of Denver, Colorado (the "State Court") captioned: *Belegratis v. Nasious*, Case No 22-DR-30041 (District Court, City and County of Denver, Colorado) (the "Divorce Case").[38]  Immediately thereafter, the Debtor and Mr. Nasious separated.  The Debtor moved back to her Mother's Home.  At the time of their separation, the Debtor was three months pregnant.  Later, she gave birth to a son (fathered by Mr. Nasious).  The Divorce Case between the Debtor and Nasious was extremely acrimonious.

The Law Firm (through attorney David W. Heckenbach) represented the Debtor in the Divorce Case.  The Debtor submitted a "Petitioner's Sworn Financial Statement,"[39] in which she identified her ownership of the Troy Street Property, a $1,845.59 monthly mortgage obligation, and estimated monthly net rent of $254.00.[40]  During the Divorce Case, the Debtor consistently claimed that the Troy Street Property was a "rental property."

On October 28, 2023, the State Court issued "Permanent Orders" in the Divorce Case (the "Permanent Orders").[41]  In the Permanent Orders, the State Court valued the Troy Street Property at $488,000.00 and noted that it was rented and "income-generating."  The State Court awarded the Troy Street Property to the Debtor "solely and separately."  The State Court directed that the Debtor's son reside solely with the Debtor (subject to visitation and parenting time with Mr. Nasious along with joint-decision-making).  The State Court awarded the Debtor no maintenance and only $68.00 per month in child support payments to be made by Mr. Nasious.  The Debtor was unhappy with the Permanent Orders and the representation by the Law Firm in the Divorce Case.

## C.   The Judicial Lien.

The Debtor did not pay the Law Firm the attorneys' fees she owed it for representing her in the Divorce Case.  On February 1, 2024, the Law Firm filed a "Motion to Determine Validity of Attorneys' Lien and For Order Reducing Attorneys' Lien to Judgment"[42] with the State Court.  Shortly thereafter, the Law Firm issued a "Notice of Claim for Attorneys' Lien."[43]  On March 5, 2024, the Divorce Court entered an "Order: Motion to Determine Validity of Attorneys' Lien and for Order Reducing Attorneys' Lien to Judgment with attach" (the "Attorneys' Lien Order").[44]  The Attorneys' Lien Order granted the Law Firm judgment against the Debtor in the amount of $72,470.42 together with

---

[38]   *Id.*
[39]   HL Ex. 2.
[40]   *Id.*
[41]   Debtor Ex. E.
[42]   HL Ex. 5 at 2-4.
[43]   HL Ex. 6.
[44]   HL Ex. 5.

interest at the rate of 18% per annum compounded annually (the "Judgment").[45]  The Law Firm recorded the Transcript of the Judgment with the Arapahoe County Clerk on April 12, 2024 at Reception No. E4022120.[46]  The Court finds that the Law Firm has a valid lien against the Troy Street Property by virtue of the Judgment which the Court refers to as the "Judicial Lien."

**D.**    **Lease of the Troy Street Property.**

The Debtor leased the Troy Street Property to tenants to generate income between 2008 (when the Troy Street Property was purchased by the Debtor) through approximately April 30, 2024.  The Court did not receive evidence regarding all historical leases.  However, on an uncontested basis, the Debtor testified that she leased the Troy Street Property for many years.  More recently, the Debtor rented the Troy Street Property to three tenants pursuant to a "Lease Agreement (Renewal)" for $2,100.00 per month from November 1, 2022 to April 31, 2023.[47]  The use of the word "Renewal" in the heading suggests that the same tenants rented for a prior period.  Then, the Debtor entered into another Lease Agreement with the same tenants for an additional eleven months (April 1, 2023 to April 30, 2024) for an increased rent of $2,500.00 monthly.[48]

Per the Debtor's bank account statements at US Bank, N.A., the Debtor received $2,500.00 rent payments for the Troy Street Property in the months of August and December 2023.[49]   The Debtor received $2,000 rent payments in the months of January, February, March, and April 2024.[50]  Finally, the Debtor received a $2,100 payment in June 2024.[51]  The foregoing confirms that the tenants likely occupied the Troy Street Property in late 2023 and early 2024.

**E.**    **The Pre-Petition Transfers of the Troy Street Property.**

On November 14, 2023, not quite a month after the Permanent Orders entered, the Debtor "as settlor . . . and as Trustee" formed the Kefalonia Revocable Trust (the "Trust").[52]  The "Trust Agreement for the Kefalonia Revocable Trust" shows that the "initial trust estate" consisted of only the Troy Street Property.  On the same day that the Trust was formed (November 14, 2023), the Debtor executed a "Bargain and Sale Deed" (the "Deed to Trust") transferring the Troy Street Property to the Trust for "consideration of less than five hundred dollars."[53]  The Deed to Trust was recorded in the real property records

---

[45]    *Id.*
[46]    HL Ex. 7.
[47]    NN Ex. 49
[48]    Tr. Ex. 8; NN Ex. 50.
[49]    Tr. Ex. 13 at 75 and 63.
[50]    *Id.* at 55, 45, 39, 30, 21.  There were two rent payments made in April, one on April 4, 2024 and the second on April 29, 2024.
[51]    *Id.* at 12.
[52]    NN Ex. 52.
[53]    NN Ex. 41

of Arapahoe County, Colorado.[54]  The transfer of the Troy Street Property from the Debtor to the Trust smacks of impropriety.

However, in early 2024, the Debtor met with bankruptcy counsel.  Promptly thereafter, on March 11, 2024, the Debtor executed a new "Bargain and Sale Deed" (the "Deed to Debtor") transferring the Troy Street Property out of the Trust and back to herself.[55]  The Deed to Debtor was recorded in the real property records of Arapahoe County, Colorado.[56]  So, the Debtor effectively reversed the suspect Deed to Trust transaction.

**F.      Troy Street Property Ownership and Encumbrances.**

As a result of the March 11, 2024 Deed to Debtor, the Debtor once again became the owner of the Troy Street Property.[57]  Except for the short interval (November 14, 2023 to March 11, 2024) when the Debtor transferred the Troy Street Property from herself to the Trust, she has owned the Troy Street Property continuously since 2008.  The Troy Street Property is encumbered by two liens.  United Wholesale Mortgage, LLC ("United Mortgage") holds a first Mortgage Lien on the Troy Street Property pursuant to a "Deed of Trust," dated February 23, 2022.[58]  The United Mortgage Deed of Trust is a result of the Debtor's refinancing of the Troy Street Property.  As of the Petition Date, the Debtor owed United Mortgage $290,513.47.[59]  As set forth above, the Law Firm holds the second position Judicial Lien, in the amount of $74,041.97 (*i.e.,* $72,470.60 plus interest).  There are no other encumbrances on the Troy Street Property.[60]

**G.      The Debtor's Move to the Troy Street Property.**

The Debtor did not live in the Troy Street Property for the lengthy period from 2008 through 2023.  Instead, she lived in her Mother's Home from at least 2008 until March 2020 when she moved into the Marital Residence owned by her mother after her wedding to Mr. Nasious.  Shortly after the Debtor commenced the Divorce Case (January 15, 2022), the Debtor moved from the Marital Residence back to her Mother's Home.  The foregoing findings are not contested by the Trustee, Mr. Nasious, or the Law Firm.  But what happened next is.

**1.      The Debtor's Testimony.**

At trial, the Debtor testified that she and her son moved into and occupied the Troy Street Property in "early May 2024."  She was unable to provide a more specific date. (However, in a Section 341 examination conducted on October 14, 2024, the Debtor

---

[54]      *Id.*
[55]      NN Ex. 42; Debtor Ex. F at 4.
[56]      *Id.*
[57]      Debtor Ex. F; NN Ex. 47.
[58]      Debtor Ex. F at 5.
[59]      Tr. Ex. 1. at 30.
[60]      Debtor Ex. F.

testified slightly differently that the move occurred on May 24, 2024.[61])  Per the Debtor, the Troy Street Property was vacant when she moved in since the most recent lease ended on April 30, 2024.  The Debtor swore that she moved at least the following items into the Troy Street Property: two sets of full-sized mattresses; six folding chairs; baby toys; a child's highchair; pots; pans; kitchen towels; a large folding kitchen table; clothes; bathroom towels; a rug; a lamp; and some pictures.  Because the Debtor did not own any other personal property (except a picnic table), she did not move much more.  She testified that she did not own a television and confirmed that no television was moved into the Troy Street Property.  The Debtor stated that she moved in "everything you need so I can make it my home."

She swore that she and her son lived continuously in the Troy Street Property for an approximately 10-month period from early May 2024 until March 2025.  Importantly, the Debtor testified that she lived in the Troy Street Property on the Petition Date: August 21, 2024.

At the time of the move, the Debtor did not own a vehicle.  The Debtor testified that her mother owned two cars (a black Cadillac and a silver Lexus); so the Debtor borrowed one or the other of her mother's vehicles while she resided at the Troy Street Property.  She mainly parked the borrowed vehicles on a driveway next to the Troy Street Property.

Per the Debtor, she sometimes drove with her son to visit her mother in her Mother's Home and "check-up on her."  The Debtor, her son, and mother also sometimes had lunch or dinner at her Mother's Home.  The Debtor conceded that she and her son stayed overnight at her Mother's Home "maybe two or three times" during the entire 10-month period from early May 2024 until March 2025.  But, most of the Debtor's visits with her mother went in the other direction.  The Debtor testified that her mother (who was about 75 years old at the time) drove to the Troy Street Property almost daily to provide childcare for the Debtor's son.

### 2.   Evidence Corroborating the Debtor's Testimony.

#### a.   Testimony of Terrell Yiannikis.

The Debtor called Terrell Yiannikis ("Mr. Yiannikis") as a witness.  Mr. Yiannikis is a true neutral not beholden to the Debtor or her family.  He graduated from the University of Colorado with a degree in mathematics and applied sciences.  His long career has included work in the airline industry, owning and operating a restaurant, and real estate investment.  He grew up three blocks from the Troy Street Property and is very familiar with the area.

Mr. Yiannikis owns a single-family home at 1120 Troy Street, Aurora, Colorado (the "Yiannikis Property"), which he operates as a rental property.  The Yiannikis Property is directly across the street from the Troy Street Property.  Mr. Yiannikis manages, repairs,

---

[61]      NN Ex. 36 at 56.

and maintains the Yiannikis Property himself.  So, he is at the Yiannikis Property frequently.  There is a direct line of sight to the Debtor's Troy Street Property.

Mr. Yiannikis first met the Debtor in May 2024.  He had gone to the Yiannikis Property to collect rent.  While there, he saw the Debtor across the street at the Troy Street Property.  He approached and introduced himself to the Debtor but did not enter the Troy Street Property at that time.  He saw the Debtor at the Troy Street Property on other occasions in May 2024.  the tenants in the Yiannikis Property moved out in June 2024, leaving it in significant disrepair.  Mr. Yiannikis was forced to be at the Yiannikis Property daily (or almost daily) to make needed repairs.  During the period from May to late August 2024, Mr. Yiannikis observed the Debtor and her son at the Troy Street Property almost every day.  From his vantage point, he saw lights on in the Troy Street Property at night (sometimes after 10:00 p.m.) when he was finishing his work.  Mr. Yiannikis also met the Debtor's mother and saw her at the Troy Street Property about a dozen times.  Mr. Yiannikis observed the Debtor and her mother parking their cars (which he described as a silver Lexus and black Cadillac) in the driveway on the side of the Troy Street Property almost every day he was at the Yiannikis Property.

In August 2024, the Debtor invited Mr. Yiannikis into the Troy Street Property; so, he had a chance to observe the interior of the Troy Street Property first-hand.  Mr. Yiannikis was impressed with the Troy Street Property.  It was well-maintained and updated.  He noted the granite countertops in the kitchen and the typical kitchen utensils. Mr. Yiannikis saw some furniture in the Troy Street Property, including a table in the dining area and some beds in the bedrooms.  He did not see a television or any couches. Having been an investor in real estate for many years, Mr. Yiannikis testified that is familiar with the concept of "staging" an unoccupied house for sale by placing furniture in a property to provide "lived in" feel.  He swore that the Troy Street Property did not look staged.  Mr. Yiannikis concluded that the Debtor and her son lived there.

On cross-examination, counsel for Mr. Nasious asked Mr. Yiannikis whether he knew the Debtor was at the Troy Street Property at night and in the early mornings.  (The implication of the question was that the Debtor might have occasionally been at the Troy Street Property during the day but may not have really been living there since she was not present overnight.)  Mr. Yiannikis testified that he had seen the Debtor at the Troy Street Property at night and early in the mornings.  One episode stood out.  During the evening of July 1, 2024, Mr. Yiannikis was not at the Yiannikis Property.  But, the Debtor called him to alert him that she had seen a break-in at the Yiannikis Property that evening.

Overall, the Court found Mr. Yiannikis to be highly credible and neutral.  His testimony strongly bolstered the Debtor's testimony that she lived at the Troy Street Property during the entire 10-month period from early May 2024 until March 2025.

### b.   Testimony of the Debtor's Brother.

The Debtor's brother, Louie Belegratis, the elder of the Debtor's two brothers, testified that he spoke with the Debtor in August 2024 about her intentions to live at the

Troy Street Property.  He said that she informed him that she wanted to stay at the Troy Street Property.  Mr. Belegratis confirmed that the Debtor lived at the Troy Street Property and noted that his mother sometimes stayed the night at the Troy Street Property with the Debtor and the Debtor's son.

### c.   Documentary Corroboration.

The Court admitted copies of two of the Debtor's Driver Licenses into evidence. On May 7, 2024, presumably at the Debtor's request, the Colorado Department of Motor Vehicles issued the Debtor a new Colorado Driver License which listed the Troy Street Property as her address.[62]  On June 5, 2025, the Colorado Department of Motor Vehicles issued the Debtor a new Colorado Driver License which listed her Mother's Home as her address.[63]

The Court admitted copies of four utilities statements from Xcel Energy (for electrical service and natural gas service) covering the service periods of May 1 to June 13, 2024 and August 12 to October 14, 2024.[64]  All of the utilities statements list the "Service Address" as "Melpo Belegratis Nasious, 1119 Troy Street, Aurora, Colorado 80111."  Since the last lease of the Troy Street Property required the tenants to pay for utilities,[65] the implication is that the Debtor (not tenants) was at the Troy Street Property and, further, the Troy Street Property was not empty.

The Court admitted the Debtor's bank statements at U.S. Bank for the period from July 19, 2023 through August 15, 2024.[66]  The bank statements covering the period from July 19, 2023 through April 15, 2024 are addressed to the Debtor at her Mother's Home.[67] However, the bank statements covering the period from April 15, 2024 through August 15, 2024 are addressed to the Debtor at the Troy Street Property.[68]

All of the foregoing documents weakly corroborate the Debtor's testimony that she lived at the Troy Street Property during the entire 10-month period from early May 2024 until March 2025.  None of the documentation, however, is definitive.

### 3.   Evidence Contrary to the Debtor's Testimony.

None of the Objectors presented testimony conflicting with the Debtor's testimony about her occupancy of the Troy Street Property.  That is, no witness swore that the Debtor and her son did <u>not</u> live at the Troy Street Property during the 10-month period from early May 2024 until March 2025.  And, the Objectors made no headway on the issue in cross-examination of the Debtor, Mr. Yianikkis, or Mr. Belegratis either.  However,

---

[62]  Debtor Ex. B.
[63]  *Id.*
[64]  Debtor Ex. G.
[65]  Tr. Ex. 8.
[66]  Tr. Ex. 13.
[67]  *Id.* at 27-80.
[68]  *Id.* at 1-26.

the Objectors presented a few scraps of documentary evidence calling the Debtor's testimony of occupancy into question.

First, a process server served the Debtor personally with legal process in the Divorce Case at the Mother's Home (not the Troy Street Property) on June 11, 2024.[69] That evidence shows that the Debtor was not at the Troy Street Property at the exact time of service on June 11, 2024. However, it does not disprove the Debtor's occupancy of the Troy Street Property during the relevant period. After all, the Debtor testified that she visited her mother two to three times a week at her Mother's Home. And, the foregoing says nothing about whether the Debtor occupied the Troy Street Property on the Petition Date.

Second, at Mr. Nasious' request, the Court admitted into evidence copies of the Debtor's annual insurance declarations for the Troy Street Property for the periods from November 19, 2022 to November 19, 2026.[70] All of the insurance declarations (even those in effect between early May 2024 and March 2025) were issued to the Debtor at the address of her Mother's Home and describe the Troy Street Property as a "One Family Dwelling; Tenant Occupied."[71] The insurance declarations weakly suggest that the Debtor did not live at the Troy Street Property because it was supposed to be "tenant occupied." However, the insurance declarations plainly are not definitive and may be explained as the Debtor's error when renewing for the November 2024 renewal period.

Third, per the Debtor's bank account statements at US Bank, N.A., the Debtor received a $2,000 rent payment in late April 2024[72] and a $2,100 rent payment in June 2024.[73] Again, this evidence suggests that the Debtor did not occupy the Troy Street Property in May and June 2024. However, the Court notes that the rent payments received by the Debtor for five months (January, February, March, April, and May 2024) were for only $2,000.00 rather than the lease requirement of $2,500.00 per month. And, the Court received no evidence of payments made by the tenants for September, October, and November 2023. So, perhaps, the payments received by the Debtor for May and June 2024 were "catch-up" payments for delinquent rent that was due before May 2024? Or maybe not. The Court has no way of knowing.

Finally, the Court admitted into evidence copies of the Debtor's Federal Income Tax Returns for the tax years 2022 to 2024, all of which list the Debtor's address as her Mother's Home.[74] Some of the information on the Debtor's Federal Income Tax Returns matches with the Debtor's SOFA; but some does not. For example, for 2022, the Debtor disclosed wage income of $22,549.00 and rental income of $12,697.00 on her SOFA.[75] Those disclosures match exactly with the Debtor's 2022 Federal Income Tax Return.[76]

---

[69]   NN Ex. 30.
[70]   NN Exs. 53-56.
[71]   *Id.*
[72]   Tr. Ex. 13 at 21.
[73]   *Id.* at 12.
[74]   NN Exs. 57-63; Tr. Ex. 16.
[75]   Tr. Ex. 1 at 9.
[76]   NN Ex. 57 at 2.

For 2023, the Debtor disclosed wage income of $16,952.00 and rental income of $30,000.00 on her SOFA.[77]  But in the Debtor's 2023 Federal income Tax Return, the Debtor disclosed wage income of $16,952.00 (which matches) and $-6,386.00 in rental income (based on zero rental days) and a deductible real estate loss.[78]  Finally, for 2024, the Debtor disclosed wage income of $4,559.33 and rental income of $12,697.00 on her SOFA for the period from January 1 to August 21, 2024.[79]  But in the Debtor's 2024 Federal income Tax Return, the Debtor disclosed full year wage income of $4,559.00 (which matches) and $18,000.00 in rental income (based on 120 rental days).[80]  If the Debtor had leased the Troy Street Property for $2,500.00 in 2024, then it would take more than seven months to generate $18,000.00 in rental income.  The foregoing suggests that the Debtor might not have moved into the Troy Street Property in May 2024.  But, again, it is not definitive.  The Debtor testified that the Federal Income Tax Returns may be in error and may need to be amended.  But regardless, the foregoing says nothing about whether the Debtor occupied the Troy Street Property on the Petition Date.  At best, it shows discrepancies between the SOFA and the 2023 and 2024 Federal Income Tax Returns.

The foregoing is the only evidence assembled by the Objectors attempting to negate the Debtor's occupancy of the Troy Street Property on the Petition Date.  Obviously, it is weak and not dispositive.

### 4. The Court Finds that the Debtor Lived at the Troy Street Property From Early May 2024 through March 2025.

The Debtor's occupancy of the Troy Street Property was the principal evidentiary dispute at the Trial.  The Court has carefully considered all of the testimony and documents.  With respect to testimony, the first witness was the Debtor.  The Debtor testified repeatedly that she lived at the Troy Street Property with her son from "early May 2024" through March 2025, which includes the Petition Date.  The Court found the Debtor to be combative and not wholly credible.  However, her testimony was consistent throughout the trial.  And, no other witness provided testimony contrary to the Debtor's testimony.  Her testimony was not shaken on cross-examination either.  The second witness was Mr. Yiannikis.  The Court found Mr. Yiannikis to be exceptionally credible.  He was neutral and forthright.  His testimony strongly bolstered the Debtor's testimony in virtually all respects.  He saw the Debtor and her son at the Troy Street Property almost daily and at all hours including the early morning, mid-day, and evenings.  He observed the same vehicles at the Troy Street Property that the Debtor testified she and her mother drove.  He saw the Debtor's mother at the Troy Street Property on numerous occasions.  He entered the Troy Street Property and observed the Debtor and her son living there with furnishings matching the Debtor's description.  The third witness, the Debtor's brother, Louie Belegratis, also supported the Debtor's account.

---

[77]     Tr. Ex. 1 at 9.
[78]     NN. Ex. 58 at 2 and 6.
[79]     Tr. Ex. 1 at 9.
[80]     NN. Ex. 59 at 6

With respect to documentary evidence, none of it was definitive. The Debtor's last lease of the Troy Street Property before the Petition Date showed an end date of April 30, 2024, which suggests that the Troy Street Property was vacant so that the Debtor could move in during early May 2024. The addresses on the Debtor's Colorado Driver Licenses, Excel Utility statements, and bank accounts listed the Troy Street Property as her address from early May 2024 through March 2025. So, such exhibits weakly support the Debtor's account; however, the Debtor may have initiated the changes to try to bolster her position.

On the other hand, the documents presented by the Objectors were also non-definitive. The Debtor was at her Mother's home on June 11, 2024 and was served with process there. The Debtor's property insurance declaration for November 2024 was not changed to reflect the Debtor's residency at the Troy Street Property. The Debtor received a rent payment in June 2024 (although such payments might have been for delinquent rent). Some of the information on the Debtor's Federal Income Tax Returns does not match the Debtor's SOFA. On her Federal Income Tax Return, the Debtor stated that she received $18,000.00 of rent for 2024, which may suggest that the Troy Street Property was rented in the spring and early summer of 2024.

Weighing all the foregoing, the Court concludes and finds that the Debtor and her son did live at the Troy Street Property from early May 2024 through March 2025 — including as of the Petition Date. Furthermore, they occupied the Troy Street Property with their possessions, presence, and personal property to the exclusion of other persons (such as tenants). The personal property the Debtor relocated to the Troy Street Property included: two sets of full-sized mattresses; six folding chairs; baby toys; a child's highchair; pots; pans; kitchen towels; a large folding kitchen table; clothes; bathroom towels; a rug; a lamp; and some pictures. The Debtor did not own any other material personal property. Notably, during closing argument, the Trustee conceded "the issue of the Debtor occupying the [Troy Street] property" "on or around the time of the bankruptcy." The Court also finds that the Troy Street Property was the Debtor's only residence from early May 2024 through March 2025; she did not live anywhere else.

## H.     The Debtor's Post-Bankruptcy Move from the Troy Street Property.

The Court has already determined that the Debtor resided at the Troy Street Property with her son as of the Petition Date. But, at that time, the Debtor was unemployed and receiving income of only $68.00 per month for child support payments from Mr. Nasious.[81] The Debtor's bank statements from U.S. Bank, N.A. also show that the Debtor received unemployment benefits of $213.00 biweekly for the period from March 21, 2024, until June 11, 2024.[82] Meanwhile, the Debtor owed $290,513.47 to United Mortgage under the Mortgage Lien,[83] and was obligated to make monthly mortgage payments of approximately $1,890.00. Since the Debtor was unable to make her monthly mortgage payments and meet her other costs of living, the Debtor's mother

---

[81]     Tr. Ex. 1 at 49.
[82]     Tr. Ex. 13 at 29-30, 21, and 11-12.
[83]     Tr. Ex. 1 at 30.

helped her and covered such expenses throughout the time that the Debtor resided at the Troy Street Property.  The lack of income was becoming increasingly untenable; she could no longer afford to live at the Troy Street Property.

On March 17, 2025, the Debtor took a job as a dental assistant for her brother, Tasos Belegratis.  Her initial gross pay was $2,600.00 per month.  It would have been very difficult for the Debtor to continue to live at the Troy Street Property if her only income was such amount and without her mother's assistance.  Thus, the Debtor decided to move out of the Troy Street Property so that it could be leased and generate additional income for her.  On March 11, 2025, the Debtor entered into a 12-month lease of the Troy Street Property with five tenants (the "March 2025 Lease").[84]  The March 2025 Lease provided for a term beginning on April 1, 2025 with $2,500.00 month rent payments to the Debtor.  After the execution of the March 2025 Lease, the Debtor and her son returned to live at her Mother's Home.

## I.    **The Debtor' Intentions.**

The Objectors have questioned the Debtor's intentions in moving to the Troy Street Property in early May 2024 and staying there until March 2025.  Although as set forth below, such intentions may not be legally relevant to the Debtor's Homestead Exemption Claim, the Court makes factual findings on the topic.  The Debtor purchased the Troy Street Property in 2008.  At that time, her intent for the immediate and intermediate term was to lease the Troy Street Property to generate income.  She did so from 2008 through 2023.  However, except for the short period of her marriage with Mr. Nasious, the Debtor always had an intent to move into the Troy Street Property "eventually" (*i.e.,* at some unidentified point in the future).  By 2024, the Debtor was concerned with her mother's age and health.  At that point, the Debtor was living in her Mother's Home.  The Debtor and her siblings knew that if their mother passed away, their mother's estate plan provided for sale of her Mother's Home and the Marital Residence with the net proceeds to be split equally between the Debtor and her siblings.  So, the Debtor understood that she could not stay at her Mother's Home forever.  At least one of the Debtor's motivations for moving from her Mother's Home to the Troy Street Property in early May 2024 was to establish herself in her own home for the future and "move on with life."  And, the Debtor, who already was considering a bankruptcy filing and had consulted with a bankruptcy attorney, also knew that living in the Troy Street Property would bolster her possible future assertion of a homestead exemption claim.

In any event, the Debtor's move to the Troy Street Property in early May 2024 was not economically beneficial for her (at least in the short term).  The Debtor lost income generated from lease of the Troy Street Property.  Given that she was unemployed at the time, the Debtor knew that she would have to rely on her mother to help pay her monthly mortgage payments as well as other costs of living.  Her mother assisted financially.  Even though there were financial issues, the Debtor wanted to stay at the Troy Street Property.  In any event, the Debtor did not become employed again until March 2025; and even then, her income level would have made it difficult for her to pay her monthly

---

[84]    NN Ex. 51.

mortgage payments as well as other costs of living.  So, she moved back to her Mother's Home in March 2025.  However, the Debtor still has the long-term intent to eventually move back to the Troy Street Property as her home and hopes to do so in two to three years.

## V.   Legal Conclusions.

### A.   The Exemption Dispute.

The Debtor asserted a $250,000.00 Homestead Exemption Claim in the Troy Street Property under Colorado law.  The Trustee, Mr. Nasious, and the Law Firm contested the Debtor's Homestead Exemption Claim on a myriad of grounds in the Exemption Objections.

#### 1.   General Exemption Framework.

The commencement of a bankruptcy case creates an estate that includes "all legal or equitable interests of the debtor in property."  11 U.S.C. § 541(a).  However, a debtor may exempt certain property from the bankruptcy estate.  11 U.S.C. § 522(b); *see also Kulp v. Zeman (In re Kulp),* 949 F.2d 1106, 1107 (10th Cir. 1991).  Section 522 contains a list of approved federal exemptions but also permits States to "opt-out" from federal exemptions and substitute State exemptions instead.  Colorado elected to "opt-out" from the federal exemption scheme.  COLO. REV. STAT. § 13-54-107 (federal exemptions are "denied to residents of this state"; Colorado residents may only claim exemptions under Colorado statutes).  As a result, Colorado law generally governs exemptions claimed by Colorado residents such as the Debtor.  11 U.S.C. § 522; *Law v. Siegel*, 571 U.S. 415, 425 (2014) ("when a debtor claims a *state-created* exemption, the exemption's scope is determined by state law") (emphasis in original); *Kulp*, 949 F.2d at 1107-08 (interpreting Colorado exemption statutes); *Mueller v. Redmond (In re Mueller)*, 867 F.2d 568 (10th Cir. 1989) (applying Kansas law to claim of exemption); *In re Romero,* 533 B.R. 807, 810-11 (Bankr. D. Colo. 2015), *aff'd*, 579 B.R. 551, 557 (D. Colo. 2016).

Under the Bankruptcy Code as applied in opt-out-States, exemptions are determined by the State law "that is applicable on the date of the filing of the petition to the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition ...."  11 U.S.C. § 522(b)(3)(A); *see also Myers v. Matley*, 318 U.S. 622, 628 (1943) (pre-dating Bankruptcy Code but providing: "the bankrupt's right to a homestead exemption becomes fixed at the date of filing of the petition in bankruptcy . . . ."); *White v. Stump*, 266 U.S. 310, 312 (1924) (pre-dating Bankruptcy Code but holding: "the state laws existing when the petition is filed [are] the measure of the right to exemptions."); *Marcus v. Zeman (In re Marcus)*, 1 F.3d 1050, 1052 (10th Cir. 1993) ("We hold that the law in effect on the date of [bankruptcy] filing controls what exemptions will be available to a debtor . . . .").  This legal principle, embedded in the Bankruptcy Code is sometimes referred to colloquially as the "snapshot" rule. *Rockwell v. Hull (In re Rockwell)*, 968 F.3d 12, 18 (1st Cir. 2020) (as applied to bankruptcy

exemptions, the " 'snapshot' rule [means that] the debtor's financial situation is frozen in time [as of the petition date], as if someone had taken a snapshot of it.").

In any event, "[o]nce an exemption is asserted, the party objecting to the exemption has the burden of proving that the exemption is not properly claimed." *Romero*, 533 B.R. at 811 (citing Fed. R. Bankr. P. 4003(c); *In re Larson*, 260 B.R. 174, 186 (Bankr. D. Colo. 2001)). "If, however, the objecting party can produce evidence to rebut the exemption, then the burden shifts to the debtor to produce evidence demonstrating that the exemption is proper. The burden of persuasion remains with the objecting party." *Id*.

### 2.    <u>Applicable Colorado Exemption Statutes</u>.

In 1876, when Colorado became a State, the sanctity of the homestead exemption was incorporated into the Colorado Constitution and a new statute: General Laws, Chap. XLVI, § 1343 (1876). Both the Colorado Constitution and an unbroken line of Colorado cases instruct that Colorado exemptions (especially the homestead exemption) are to be construed liberally in favor of Colorado residents claiming such exemptions. *See* COLO. CONST., Art. XVIII § 1 ("The general assembly shall pass liberal homestead and exemption laws."); *Romero*, 579 B.R. at 556 (recognizing that homestead exemption is to be liberally interpreted); *Kulp*, 949 F.2d at 1108 (interpreting Colorado exemption liberally based on Colorado Constitution); *In re Case*, 66 B.R. 44, 45 (Bankr. D. Colo. 1986) (same).

With that background in mind, per the Debtor's Schedule C Homestead Exemption Claim, the Debtor contended that the Troy Street Property is exempt under five related Colorado statutes: (1) COLO. REV. STAT. § 38-41-201(1)(a); (2) COLO. REV. STAT. § 38-41-201.6; (3) COLO. REV. STAT. § 38-41-201.7; (4) COLO. REV. STAT. § 38-41-202; and (5) COLO. REV. STAT. § 38-41-205.[85] The Court examines each in turn (although in a slightly different order).

COLO. REV. STAT. § 38-41-201(1)(a) is the principal Colorado homestead exemption statute which traces its lineage to 1868. The version of the homestead exemption applicable when the Debtor filed for bankruptcy protection states, in relevant part:

> Every homestead in the state is exempt from execution and attachment arising from any debt, contract, or civil obligation not exceeding in actual cash value in excess of any liens or encumbrances on the homesteaded property in existence at the time of any levy of execution thereon: (a) The sum of two hundred fifty thousand dollars *if the homestead is occupied as a home by an owner or an owner's family.*

COLO. REV. STAT. § 38-41-201(1)(a) (emphasis added).

---

[85]    Tr. Ex.1 at 27.

Subsequent statutory provisions dictate the Colorado legislature's very expansive view of what constitutes a homestead.  COLO. REV. STAT. § 38-41-205, cited by the Debtor, provides, in relevant part:

> The homestead mentioned in this part 2 may consist of: (a) *a dwelling*, as defined in section 38-41-201.7; (b) a house and lot or lots, including manufactured homes, mobile homes, trailers, and trailer coaches as set forth in section 38-41-201.6; or (c) a farm consisting of any number of acres.

COLO. REV. STAT. § 38-41-205(1)(a)-(c) (emphasis added).

The Colorado legislature recently defined the term "dwelling" in a new statute, COLO. REV. STAT. § 38-41-201.7 (added in 2022 (SB 22-086)), which the Debtor cited. COLO. REV. STAT. § 38-41-201.7 states, in relevant part:

> (1)     As used in this part 2, unless the context otherwise requires, "dwelling" means conventional housing and personal property that is actually used as a residence, including:
>
> > (a)     A vehicle . . . including any trailer . . . .;
> > (b)     A vessel . . .;
> > (c)     A camper coach . . .;
> > (d)     Mounted equipment . . .;
> > (e)     A railway car;
> > (f)     A shipping or cargo container or shed;
> > (g)     A yurt; and
> > (h)     A tiny home, whether movable on wheels or stationary on a foundation.

COLO. REV. STAT. § 38-41-201.7(1)(a)-(h).  This provision was adopted in the wake of decisions, like *Romero*, 533 B.R. 807, which had construed the term "homestead" as requiring an association with land.  In seeming response, the Colorado Legislature adopted an exceedingly broad concept of the term "homestead" including personal property not associated with land (such as vehicles, campers, and vessels) as well as moveable personal property often placed on land (such as shipping containers, sheds, and yurts).

The Debtor also referenced COLO. REV. STAT. § 38-41-202.  The relevant part of that statute governs the creation of the homestead exemption:  "(1) The homestead exemptions described in section 38-41-201 shall be deemed created and may be claimed if the occupancy requirements of section 38-41-203 and the requirement of section 38-41-205 relating to the type of property which may be homesteaded are met."  COLO. REV. STAT. § 38-41-202(1).  In other words, the homestead exemption "attaches automatically

19

upon occupancy of the real [or personal] property as a home by the owner . . . ."  *Univ. Nat'l Bank v. Harsh*, 833 P.2d 846, 847 (Colo. App. 1992).

Colo. Rev. Stat. § 38-41-202 cross-references Colo. Rev. Stat. § 38-41-203, which contains the occupancy requirement:  "Said property, when so homesteaded, *shall only be exempt as provided in this part 2 while occupied as a home by the owner thereof or his family*."  Colo. Rev. Stat. § 38-41-203 (emphasis added).  The key phrase "occupied as a home" matches Colo. Rev. Stat. § 38-41-201(1)(a).

Finally, the Debtor asserted Colo. Rev. Stat. § 38-41-201.6 as a basis for her Homestead Exemption Claim.  Colo. Rev. Stat. § 38-41-201.6 is titled "Mobile home, manufactured home, trailer, and trailer coach homestead exemption" and deals exclusively with those types of homesteads.  The Troy Street Property is not a mobile home, manufactured home, trailer, or trailer coach.  So, nothing in Colo. Rev. Stat. § 38-41-201.6 expressly supports the Debtor's Homestead Exemption Claim except that such statute again shows the broad nature of the homestead exemption in Colorado.

To summarize and paraphrase the relevant Colorado statutory scheme in place as of the Petition Date, every homestead in Colorado is exempt from execution and attachment for any debt to the extent of "two hundred fifty thousand dollars if the homestead is occupied as a home by an owner thereof or an owner's family."  The homestead exemption can only be applied if the property qualifies as a "homestead" and is "occupied as a home by an owner . . . ."  Based on changes to homestead law enacted by the Colorado Legislature in 2022, the term "homestead" now has an extremely broad meaning and encompasses both real and personal property including: dwellings, houses, mobile homes, manufactured homes, trailers, trailer coaches, vehicles, vessels, camper coaches, mounted equipment, railway cars, shipping containers, cargo containers, sheds, yurts, and tiny homes.  Even leasehold interests can qualify for homestead exemption protection.  *In re Hellman*, 474 F. Supp. 348, 350 (D. Colo. 1979).

And, again, Colorado homestead exemption claims are to be construed liberally in favor of Colorado residents claiming such exemptions.  *See* Colo. Const., Art. XVIII § 1; *Romero*, 579 B.R. at 556; *Kulp*, 949 F.2d at 1108; *Case*, 66 B.R. at 45.  Put another way, "[i]t is the longstanding policy of this state [Colorado] to preserve the home for the family, even at the sacrifice of creditors' claims."  *Harsh*, 833 P.2d at 847.  The reason "is because the exemption helps protect the homeowner and the homeowner's family from the pernicious effects of poverty and thus assists in the objective of retaining family stability."  *Id*.

### 3.   <u>Legal Analysis</u>.

The Debtor, Mr. Nasious, the Law Firm, and the Trustee all agree that the Troy Street Property is a "homestead" because it is a single-family house.  *See* Colo. Rev. Stat. § 38-41-205(1)(b) ("the homestead . . . may consist of . . . a house and lot . . . .).  And, they also agree that the Debtor owned the Troy Street Property homestead on the Petition Date.  The Court concurs.

20

However, Mr. Nasious, the Law Firm, and the Trustee part company with the Debtor because they contend that the Troy Street Property was not "occupied as a home" by the Debtor on the Petition Date as required by COLO. REV. STAT. §§ 38-41-201(1)(a) and 203.  Although the phrase "is occupied as a home" may be interpreted as a single phrase, Mr. Nasious, the Law Firm, and the Trustee also have asked the Court to consider the constituent elements of the phrase: "occupied" and "home."  They initially raised two arguments why the homestead exemption cannot be claimed by the Debtor. *First*, they alleged that the Debtor did not occupy the Troy Street Property as of the Petition Date.  *Second*, they argued that, even if the Debtor did occupy the Troy Street Property on the Petition Date, she did not occupy it "as a home."

When construing statutory words and phrases, the Court starts with the plain or ordinary meaning approach.  *Clark v. Rameker*, 573 U.S. 122, 127 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010); *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *Granite State Ins. Co. v. Ken Caryl Master Ass'n*, 183 P.3d 563, 567 (Colo. 2008) (applying plain language approach).  The inquiry must begin with the "language of the statute itself."  *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  With that principle in mind, the Court addresses the arguments in turn.

      **a.**    <u>**The Debtor Occupied the Troy Street Property on the Petition Date**</u>.

One of the requirements for a valid homestead exemption under COLO. REV. STAT. § 38-41-201(1)(a) is that "*the homestead is occupied . . . by an owner.*"  Again, all parties acknowledged, and the evidence proves, that the Debtor was and is the owner of the Troy Street Property.  The phrase "is occupied" is a past participle used as an adjective to describe the then present state of the homestead.  *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 83-84 (2017) (construing the phrase "debts 'owed ... another' " and holding that "past participles like 'owed' are routinely used as adjectives to describe the present state of a thing"); *U.S. v. Barbeito*, 2010 WL 2243878, at *16 (S.D. W. Va. June 3, 2010) (construing the "adjectival phrase" "engaged in" and concluding that "the term 'engaged in' connotes that the thing is 'presently engaged' in the activity.").  So, it stands to reason that under Colorado law, the Court must look at the then-present state of things as the date of attempted execution or attachment on the homestead.  In the context of bankruptcy, under the Bankruptcy Code as applied in opt-out-States, exemptions are determined by the State law "that is applicable on the date of the filing of the petition . . . ."  11 U.S.C. § 522(b)(3)(A); *see also Myers*, 318 U.S. at 628 (1943) (pre-dating Bankruptcy Code but providing: "the bankrupt's right to a homestead exemption becomes fixed at the date of filing of the petition in bankruptcy . . . ."); *White*, 266 U.S. at 312 (pre-dating Bankruptcy Code but holding: "the state laws existing when the petition is filed [are] the measure of the right to exemptions."); *Marcus*, 1 F.3d at 1052 ("We hold that the law in effect on the date of [bankruptcy] filing controls what exemptions will be available to a debtor ....").

The Debtor, Mr. Nasious, the Law Firm, and the Trustee all appear to agree that the Court should assess whether the Troy Street Property was "occupied" as of the Petition Date.  The term "occupied" has a plain or ordinary meaning in the context of real or personal property.  It means: took possession of or used.  The common meaning is reinforced by dictionary definitions.  Merriam-Webster's famous dictionary defines the term "occupy" as "To take possession of, occupy, employ . . . ."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 1561 (G. & C. Merriam Co. Pub., 1968).  Other dictionaries are similar.  THE COMPACT EDITION OF THE OXFORD ENGLISH DICTIONARY at 1971 (Oxford Univ. Press 1980) (occupy means "To take possession of, take for one's own use" or "To take possession of (a place) by settling in it . . . .").  Although the word "occupy" does not have any specialized or technical meaning in the field of law or otherwise, legal definitions support the common meaning.  Bryan A. Garner, BLACK'S LAW DICTIONARY at 1295 (Thompson Reuters Pub., 12th Ed. 2024) (occupy means "To seize or take possession of . . . .").

As set forth in the Court's findings of fact, the Debtor (and her son) occupied the Troy Street Property as of the Petition Date.  After tenants vacated the premises, they took physical possession of the Troy Street Property from early May 2024 through March 2025 — including as of the Petition Date.  They occupied the Troy Street Property with their presence and personal property to the exclusion of other persons (such as tenants).  The personal property the Debtor relocated to the Troy Street Property included: two sets of full-sized mattresses; six folding chairs; baby toys; a child's highchair; pots; pans; kitchen towels; a large folding kitchen table; clothes; bathroom towels; a rug; a lamp; and some pictures.  Notably, the Trustee shifted position during closing argument based upon the evidence admitted at the Trial.  The Trustee conceded "the issue of the Debtor occupying the [Troy Street] property" as of the Petition Date.

      **b.**     **The Debtor Occupied the Troy Street Property As a Home on the Petition Date.**

Although the Debtor occupied the Troy Street Property on the Petition Date, COLO. REV. STAT. § 38-41-201(1)(a) requires something more — that the Troy Street Property was "*occupied as a home*" as of the Petition Date.  COLO. REV. STAT. § 38-41-201(1)(a) (emphasis added).

The Court assesses that there is a plain or ordinary meaning for the phrase.  "Occupied as a home" simply means took possession of and used as a residence.  A "home" is someplace where a person lives or resides as contrasted to a "house" which is a mere physical structure.  Rhythm and Blues legend Luther Vandross made the same point in his famous song: *A House Is Not a Home* (1981):

> A chair is still a chair, even when there's no one sittin' there
> But a chair is not a house and a house is not a home
> When there's no one there to hold you tight
> And no one there you can kiss good night.

In other words, a home means a residence actually occupied by one or more individuals. There must be someone "there."  *See e.g.* Colo. Rev. Stat. § 25-4-1614 (9)(a) (in the context of food production regulation, "'Home' means a primary residence occupied by the producer producing the food . . . .").  In Mr. Nasious' Initial Exemption Objection (incorporated into the Final Nasious Exemption Objection), Mr. Nasious made the same point.  He stated that for the Debtor to properly assert a homestead exemption claim the Debtor "needed to occupy the property located at 1119 Troy Street, Aurora, Colorado 80011 as her *primary residence*."[86]  "Occupied as a home" can be distinguished from non-residential uses such as "occupied as an office" or "occupied as a store."  A debtor may not successfully claim a homestead exemption if the property is merely "occupied as an office" or "occupied as a store."'

The main point is that a debtor claiming a homestead exemption must show that the debtor lived at the homestead property as a residence.  For example, in *Region 12 Revolving Loan Fund Corp. v. Raymond (In re Raymond)*, 987 F.2d 675 (10th Cir. 1993), the Tenth Circuit sustained the claim of a homestead exemption because the debtor "occupied the residence on the day of filing."  *Id.* at 677.  *See also Old Republic Nat'l Title Ins. Co. v. Kornegay*, 292 P.3d 1111, 1119 (Colo. App. 2012) (rejecting Colorado homestead exemption claim because party asserting claim "did not state that he or his wife '*lived at the property.*'" Instead, claimant "was incarcerated in Nebraska and his wife was living in that state").

The Colorado Legislature recently confirmed the foregoing understanding when it dramatically expanded the Colorado homestead exemption and issued a formal non-statutory "Legislative Declaration" in 2022 which states:

> Legislative declaration.  (1)  The general assembly finds that: . . . (c) The higher cost of housing has forced many of Colorado's aging and less-wealthy individuals *to reside in unconventional housing* . . . .;  (d) Unfortunately, individuals *residing in such unconventional housing* do not enjoy protection from creditors under Colorado's [current] homestead exemption law because [of] Colorado's definition of a homestead . . . .  (4)  The general assembly therefore declares that it is in the best interests of residents of the state for the general assembly to: . . . . (b) Expand the definition of 'homestead' to expressly include a broad range of real and personal property *when such property is actually used as a dwelling or place of residence* . . . .

Colorado Laws 2022, Ch. 74 §§ 1 and 4 (S.B. 22-086) (emphasis added) (the "2022 Legislative Declaration").  Although the Court often is reticent to rely on legislative history in statutory interpretation, the 2022 Legislative Declaration is a clarifying statement of the

---

[86]   Docket No. 52 at 13 (emphasis added).

entire Colorado Legislature (not a passage from a floor debate, a statement from a single legislator, or a legislative report).  So, the Colorado Legislature's intent is ascertainable from the statutory text coupled with the non-binding Legislative Declaration.  *See Walgreen Co. v. Charnes*, 819 P.2d 1039, 1045 (Colo. 1991) ("We [the Colorado Supreme Court] have given great weight to legislative declarations in the past, but have noted that they are not binding on this court.").

Assuming that the property in question is a "homestead" (an issue not in dispute in this case), then, the only other requirement for a homestead exemption claim is that the homestead "is occupied as a home" which means "is actually used as a dwelling or place of residence."  Someone must live there.  Nothing else is required.  COLO. REV. STAT. § 38-41-202(1) ("The homestead exemptions described in section 38-41-201 shall be deemed created and may be claimed if the occupancy requirements of section 38-41-203 and the requirement of section 38-41-205 relating to the type of property which may be homesteaded are met.").  The Court determines that the Debtor proved that the Troy Street Property was "occupied as a home" on the Petition Date.  The Debtor and her son lived there as their only residence.  So, the Debtor established the required elements for a homestead exemption claim.

### c.   The Court Rejects the Objectors' Efforts to Graft Other Non-Statutory Mandates on the "As a Home" Requirement of the Colorado Homestead Exemption.

Notwithstanding the statutory text of the Colorado homestead exemption, the Objectors asserted at the Trial some other supposed requirements for occupancy "as a home."  They argue that (assuming the Debtor occupied the Troy Street Property on the Petition Date), the Debtor did not occupy such property "as a home" because: (1) the Troy Street Property was not adequately furnished; (2) the Debtor did not intend to occupy the Troy Street Property permanently (or at least for a long term); and (3) the Debtor could not afford to reside in the Troy Street Property.  The Court considers each of the foregoing arguments in turn.

First, the Objectors, especially Mr. Nasious, contend that the Debtor did not occupy the Troy Street Property "as a home" because she did not adequately furnish it.  The Court has already found that the Debtor moved the following into the Troy Street Property: two sets of full-sized mattresses; six folding chairs; baby toys; a child's highchair; pots; pans; kitchen towels; a large folding kitchen table; clothes; bathroom towels; a rug; a lamp; and some pictures.  The Objectors do not think that is enough.  In Mr. Nasious' Trial Brief, Mr. Nasious fixated on the Debtor "not mov[ing] any couches or other chairs or televisions or end tables or dressers" into the Troy Street Property.[87]  At the Trial, all the foregoing was reiterated along with the observation that the Debtor also did not hang any artwork or photographs on the walls of the Troy Street Property.  The Objectors have not identified any legal authority construing the Colorado homestead exemption statute as

---

[87]   Docket No. 165 at 8.

requiring a certain amount or type of furnishings.  Based on the Court's own independent research, there is none.

In any event, the Debtor moved what she needed to live in the Troy Street Property: beds and bedding; a table; chairs; clothes; towels; toys; kitchen utensils; pots and pans; and a few other items.  The Debtor did not have more personal property to move inside the Troy Street Property besides the basics.  She is poor.  The Colorado homestead exemption (enacted initially before Statehood in 1868) certainly does not mandate that property owners install televisions.  Besides, it would be a great folly, and even impossible, for the Court to become the arbiter of what each person must place into a homestead for it to qualify "as a home."  After all, some people live a very minimalist existence foregoing unnecessary personal property; but others pack their residences to the gills with all manner of furniture and knickknacks.

The Objectors' argument about the type of furniture necessary for a property to be "a home" ("couches or other chairs or televisions or end tables or dressers") also is belied by the recent changes to the Colorado homestead exemption law.  In addition to houses, the Colorado Legislature determined that the term "homestead" also includes, among other things: trailers, trailer coaches, vehicles, vessels, camper coaches, shipping containers, cargo containers, sheds, yurts, and tiny homes.  Can a person living in the back of an old Honda Odyssey van be required to move in a couch to assert a homestead exemption claim?  To qualify as "a home," must a family residing in an unelectrified mountain yurt install a television?  Must those living in a shed move in end tables and dressers to satisfy the Colorado homestead exemption?  Obviously, the answer to the foregoing rhetorical questions is "no."  That is because COLO. REV. STAT. § 38-41-201(1)(a) does not contain a requirement for a certain type or amount of furnishings.  All that is necessary is that the debtor occupy and live in the homestead. Thus, the Court rejects the Objectors' contrary argument.

<u>Second</u>, the Objectors argue that the Debtor's occupancy of the Troy Street Property is not "as a home" because the Debtor has not proven her intent to live there permanently (or at least for some long period of time which the Objectors have not identified with specificity).  With respect to intent, Mr. Nasious relies exclusively on decisions interpreting homestead laws in California and Oklahoma.  For example, in *Phillips v. Gilman (In re Gilman)*, 887 F.3d 956 (9th Cir. 2018), the Ninth Circuit, construing California law, stated: "To determine whether a debtor resides in a property for [California] homestead purposes, courts consider the debtor's physical occupancy of the property and *the intent to reside there*." *Id*. at 965 (emphasis added).  And, in Oklahoma, intent is also relevant.  *Robinson v. Sanchez (In re Robinson)*, 295 B.R. 147, 154 (10th Cir. BAP 2003) ("Oklahoma case law firmly establishes . . . there must be a fixed intention to make a home on the property . . . .").

Then, Mr. Nasious added another supposed requirement: permanency.  He asserts that "[t]he concept of homestead require[s] a degree of permanency."[88]  For such

---

[88]     Docket No. 165 at 31-32.

25

proposition, Mr. Nasious relies exclusively on the definition of the term "homestead" (not "home") in an 1888 dictionary,  Stewart Rapalje & Robert L. Lawrence, A DICTIONARY OF AMERICAN AND ENGLISH LAW 614 (Frederick D. Linn & Co. Pub., Jersey City 1888), which states: the term homestead means "[t]he place where a home or house is situated; the permanent residence of a person who is the head of the family, with the land and outbuildings contiguous to the house."  *Id.* The Court supposes that Mr. Nasious drew the somewhat obscure reference from the Court's decision in *Romero*, 533 B.R. at 813, in which the Court cited the same passage for a very different proposition:  "As in popular usage, legal scholars used the word 'homestead' in the context of land."  *Id*.  In any event, the dictionary source relied upon by the Objectors is a definition of the term "homestead" not the word "home."  However, all the Objectors already conceded that the Troy Street Property is a "homestead."  So, the definition of homestead is not pertinent to the remaining question at issue:  did the Debtor occupy the homestead (*i.e.,* the Troy Street Property) "as a home."

Nevertheless, the Objectors (particularly Mr. Nasious) cobbled together the concepts of intent and permanency to reach the conclusion that the Debtor's occupancy of the Troy Street Property must be with the intent to occupy it permanently in order to qualify "as a home."  There are myriad problems with the Objectors' approach.  With respect to intent and permanency, despite the citation to non-applicable California law construed in *Gilman*, 887 F.3d at 965, and Oklahoma law discussed in *Robinson*, 295 B.R. at 154, as well as the inapposite dictionary definition, the Colorado homestead statutory scheme does not require a showing of intent to occupy permanently (or for some long time).  And, tellingly, the Objectors have not cited any Colorado legal support for the proposition.[89]

Appellate courts construing *Colorado homestead exemption law* have determined that intent to reside permanently (or for some long period of time) in a homestead is not required.  The Tenth Circuit's binding appellate decision in *Raymond*, 987 F.2d 675, is particularly instructive.  In *Raymond*, debtor Valeria Raymond "owned the home for several years prior to the time that she and her husband . . . filed their petition for bankruptcy."  *Id.* at 676.  Factually:

> At the time the petition was filed, Mr. Raymond had already
> moved to Texas with the couple's children.  He had a new job
> there, had enrolled the children in school, and had leased a
> home . . . .  Mrs. Raymond remained in Colorado and lived in

---

[89]     Mr. Nasious did refer to *In re Bertola*, 2012 WL 1945426 (Bankr. D. Colo. May 30, 2012), suggesting that the decision supports the need for a debtor to prove an intent to permanently occupy a house as a predicate for homestead protection.  But the *Bertola* decision does not state or even imply that intent to permanently occupy a residence is a requirement under Colorado homestead law.  Instead, the *Bertola* court quoted a passage from *Matter of Estate of Dodge*, 685 P.2d 260, 263 (Colo. App. 1984) examining the purpose of Colorado homestead laws.  And, one of the purposes is "to secure the *permanent* habitation of the family . . . ."  *Bertola*, 2012 WL 1945426, at *2 (emphasis added).  The Court concurs.  Colorado homestead laws are meant to keep individuals and families permanently housed so that they do not become homeless.  But, that does not mean that homestead protection is only available for debtors who intend to permanently occupy a specific house or shed.

the home while she arranged for a moving company to pack
their belongings.  The belongings were shipped to Texas ten
days after the petition was filed.  At that time, Mrs. Raymond
also moved to Texas.

*Id*. at 676.  When the Chapter 7 bankruptcy trustee sold the home, Mrs. Raymond
asserted a Colorado homestead exemption.  A creditor objected arguing that "Mrs.
Raymond was *not occupying the residence as a home* at the time the bankruptcy petition
was filed" because her husband and children had already moved to Texas and Mrs.
Raymond intended to move.  *Id*. (emphasis added).  The United States Bankruptcy Court
for the District of Colorado and the United States District Court for the District of Colorado
sustained the homestead exemption claim.  On appeal, the Tenth Circuit concurred
holding:

> Although Mrs. Raymond had listed the house for sale, she
> occupied the residence on the day of filing and for ten days
> thereafter.  Her intention to move in the immediate future does
> not disqualify her homestead rights in the property.

*Id*. at 677.  The lesson of the *Raymond* decision, is that the Colorado homestead
exemption does not require that the homeowner claimant prove an intent to stay in the
homestead property permanently or for a long time.  Instead, the key inquiry is simple:
whether the debtor "occupied the residence on the day of filing."  *Id*.

Similarly, in *Romero,* 579 B.R. 551, the United States District Court for the District
of Colorado (on appeal) rejected any extra-statutory requirement of intent for future
occupation.  The *Romero* court stated succinctly:

> Debtor cites no Colorado authority, and the Court is aware of
> none, that places a similar focus on the inhabitant's intent in
> determining whether a dwelling is a 'homestead.'  Colorado's
> homestead exemption, by referencing specific types of
> dwellings that are to be deemed 'houses,' focuses on the
> nature of the dwelling rather than the intent of the occupant.

*Id.* at 555-56.

Based on the foregoing, the Court rejects the Objectors' contention that the Debtor
must prove her intent (as of the Petition Date) to reside in the Troy Street Property after
the Petition Date.  The Court cannot create a new restriction on COLO. REV. STAT. § 38-41-
201(1)(a) that is not in the text.  Certainly, the Court cannot require debtors to prove their
intent to occupy a homestead permanently (or for some long time not specified by the
Objectors).  After all, inhabitants rarely stay in the same home for their lifetimes.  The
Court also observes that the recent changes in Colorado homestead law enacted by the
Colorado Legislature in 2022 suggest the absence of any long-term occupancy intent
requirement.  Recall again that the term "homestead" now broadly includes, among other

things: trailers, trailer coaches, vehicles, vessels, camper coaches, shipping containers, cargo containers, sheds, yurts, and tiny homes. A person relegated to living in a shed should not be required to prove an intent to live in the shed permanently or for a long period of time to receive homestead protection. That would gut the Colorado Legislature's broadening of homestead rights and make no sense. Likely, shed dwellers hope and intend to leave as soon as possible; yet, under Colorado law, a shed can qualify for homestead exemption protection. The Court also notes, factually, that the Debtor actually intended to stay in the Troy Street Property as long as she could. She resided in the Troy Street Property for almost seven months after the Petition Date.

Finally, <u>third</u>, the Objectors contend that the Debtor did not occupy the Troy Street Property "as a home" on the Petition Date because the Debtor, on her own, could not afford to live there. As with the Objectors' other assertions, the economic argument is not tethered to COLO. REV. STAT. § 38-41-201(1)(a) in any way. Colorado statutory law simply does not require a debtor to show financial capacity to pay all the expenses of home ownership personally as a condition for asserting a homestead exemption. The Objectors have presented no Colorado legal sources supporting their proposition. And, it seems a particularly odd argument since the entire design of the homestead exemption is to protect homeowners in financial distress. Many debtors in bankruptcy cannot afford to pay their home mortgages. But that does not negate homestead exemption protection.

Although the Debtor admittedly had little income when she moved into the Troy Street Property in early May 2024, she expected to be assisted financially by her mother. And, she was. The Debtor's mother paid the Debtor's $1,845.59 monthly mortgage obligation to United Mortgage, as well as the Debtor's other expenses, for about ten months. Given the price of housing in the United States, and Colorado in particular, it is not uncommon for family members to assist homeowners financially. The novel and unsupported rule proposed by the Objectors would strip all such homeowners (not able to pay home mortgage debt by themselves) from the benefit of the homestead exemption. That is not the law.

### d. The Court Rejects the Section 522(o) and Fraud Arguments Advanced By Mr. Nasious.

During the Trial (including in both opening and closing statements), no party advocated that the Debtor's homestead exemption claim should be reduced or eliminated by virtue of alleged fraud or under Section 522(o). Indeed, none of the counsel for the Objectors mentioned fraud or Section 522(o); except that counsel for the Trustee clarified that the Trustee was not asserting such arguments.

Notwithstanding, one of the Objectors, Mr. Nasious, asserted obliquely in the Initial Nasious Exemption Objection:

> One of the more difficult issues in bankruptcy law is deciding when, if ever, an intent to defraud creditors can be shown by the debtor's conversion of nonexempt assets to exempt

assets." *In re Warren*, 512 F.3d 1241, 1249 (10th Cir. 2008). Admittedly, by distinguishing between an intent to use exemption laws to shield assets from creditors, and an intent to defraud those creditors, "the court is drawing a very fine line." *In re Sayler*, 98 B.R. 536, 541 (D. Kan. 1987). On the one hand, the law encourages debtors to use the exemptions to ensure a "fresh start." *In re Sanders*, 39 F.3d 258, 260 (10th Cir. 1994).

The Tenth Circuit has held that "conversion of nonexempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled." *In re Carey*, 938 F.2d 1073, 1076 (10th Cir. 1991) . . . . On the other hand, pre-bankruptcy planning is not without limits. When there is extrinsic evidence of fraud beyond the act of conversion, or when the act of conversion itself is egregious, a court may find that the debtor acted with the intent to defraud.

In analyzing whether a debtor has crossed the line from legitimate planning to fraudulent conduct, courts utilize many of the same "badges of fraud" that have been developed in connection with fraudulent transfer law. *In re Mueller*, 867 F.2d 568 (10th Cir. 1989); *In re Ludwig*, 345 B.R. 310, 320-22 (Bankr. D. Colo. 2006).[90]

In the Initial Nasious Exemption Objection, Mr. Nasious did not cite any Colorado law suggesting that the Colorado homestead exemption may be reduced or negated by alleged fraudulent conduct. And, Mr. Nasious also did not refer to Section 522(o) either.

A few days before the Trial, Mr. Nasious filed a "Brief and Memorandum in Support of Objection to Debtor's Claim of Homestead Exemption" (the "Nasious Trial Brief").[91] Mr. Nasious identified five reasons why "the Debtor's homestead exemption should be disallowed." The first four reasons centered on Mr. Nasious' contention that the Debtor did not reside in or "occupy as a home" the Troy Street Property as of the Petition Date. However, the fifth and final argument presented in the Nasious Trial Brief was that: "The Debtor's attempt to convert non-exempt rental property located at 1119 Troy Street, Aurora, CO 80011 into an exempt homestead was done with intent to hinder, delay, or defraud creditors."[92] Citing *Siegal*, 571 U.S. at 425, Mr. Nasious acknowledged that "Colorado law governs exemptions claimed by Colorado residents such as the Debtor."[93]

Later, in Paragraph 357 of the Nasious Trial Brief, Mr. Nasious stated:

---

[90]   Docket No. 52 at 13-14.
[91]   Docket No. 165.
[92]   *Id.* at 2.
[93]   *Id.* at 30.

> 11 U.S.C. § 522(b)(3)(A) is subject to 11 U.S.C. § 522(o).  *Law v. Siegel*, 571 U.S. 415 (2014), stands for the proposition that the exemptions of a debtor may not be surcharged for misconduct.  However, 11 U.S.C. § 522(o) is a specific statute which measures whether an exemption can be claimed by a debtor and allowed by the court if a debtor converts non-exempt property in to exempt property with the intent to hinder, delay or defraud creditors.[94]

To the Court's knowledge, the foregoing passage was the first time that Mr. Nasious mentioned Section 522(o).  The topic was not raised in the Initial Nasious Exemption Objection, the Renewed Nasious Exemption Objection, or the Final Nasious Exemption Objection.[95]  In any event, turning back to the Nasious Trial Brief, Mr. Nasious quoted the text of Section 522(o) and then stated:

> Therefore, the argument is made that pursuant to 11 U.S.C. § 522(o) all of the Debtor's equity in the [Troy Street Property] should be denied a homestead exemption.[96]

In the balance of the Nasious Trial Brief, Mr. Nasious argued:  "Case law interpreting that same phrase ["intent to hinder, delay, or defraud a creditor"] as used in 11 U.S.C. § 727(a)(2)(A) and 548(a)(1)(A) provides guidance to construing the same phrase in Section 522(o)."[97]  And, then Mr. Nasious invited the Court to consider so-called "badges of fraud."

Since Mr. Nasious did not raise Section 522(o) or fraud at the Trial, his last-minute pitch in the Nasious Trial Brief likely has been forfeited.  However, the Court ventures forward for completeness.  As best the Court understands Mr. Nasious' position, he is not contending that that the Debtor's alleged fraud or misconduct justifies elimination of the Debtor's homestead exemption *as a matter of Colorado state law*.  Indeed, Mr. Nasious cited no Colorado law to support that argument.  And, the Court is not aware of any Colorado case law sustaining an objection to a claim of homestead exemption based on general allegations of fraud or misconduct against a debtor homeowner who occupied a homestead as a home per Colorado exemption law.  Furthermore, Mr. Nasious acknowledges the Supreme Court's decision in *Siegel*, 571 U.S. 415, which held that "when a debtor claims a *state-created* exemption, the exemption's scope is determined by state law . . . ."  *Id.* at 425 (emphasis in original).  Importantly, Mr. Nasious also correctly conceded that the *Siegel* decision "stands for the proposition that the exemptions of a debtor may not be surcharged for misconduct [under federal law]."[98]  *See Siegel*, 571 U.S. at 425 ("But *federal law* provides no authority for bankruptcy courts to deny an

---

[94]   *Id.* at 33.
[95]   Docket Nos. 52, 107, and 115.
[96]   Docket No. 165 at 34.
[97]   *Id.*
[98]   *Id.* at 33.

exemption on a ground not specified in the Code."); *see also Scrivner v. Mashburn (In re Scrivner)*, 535 F.3d 1258 (10th Cir. 2008) (under federal law, debtor misconduct does not justify surcharge of debtor's exempt property).  Thus, the Court concludes that Mr. Nasious has shown no legal basis for the Court to overrule or reduce the Debtor's Homestead Exemption Claim under Colorado state law.

In the lurch with no viable theory for eliminating the Debtor's Homestead Exemption Claim under Colorado state law, Mr. Nasious then raised Section 522(o) at the last minute.  It is too little too late.  Section 522(o) states:

> For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), *the value of an interest* in —
>
> (1)    real or personal property that the debtor or a dependent of the debtor uses as a residence; [or]
>    . . . .
>
> (4)    *real or personal property that the debtor or a dependent of the debtor claims as a homestead*;
>
> *shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of* in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o)(1) and (4) (emphasis added).  To simplify, "Section 522(o) provides that 'the value of an interest' in real estate . . . claimed as a homestead 'shall be reduced to the extent that that such value is attributable to' the conversion of nonexempt property made with intent to hinder, delay, or defraud creditors within ten years before filing bankruptcy." *Ranta v. Krigsman (In re Ranta)*, 2025 WL 2529610, at *8 (10th Cir. BAP Sept. 3, 2025) (unpublished).   In terms of elements, a party asserting a Section 522(o) objection to a homestead exemption must show:

> (1) the debtor disposed of property within the 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the non-exempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor.

*In re Presto*, 376 B.R. 554, 568 (Bankr. S.D. Tex. 2007).

Sometimes referred to as the "mansion loophole," Section 522(o), which is a provision added to the Bankruptcy Code in 2005, "was enacted to prevent debtors — particularly in states with unlimited or generous homestead exemptions — from converting nonexempt assets into exempt homestead equity before filing bankruptcy." *Id.* at * 8. *See also Soule v. Willcut (In re Willcut)*, 472 B.R. 88, 94 (10th Cir. BAP 2012) (Section 522(o) was an attempt to address the "mansion loophole").

The core of Mr. Nasious' not-very-well-developed Section 522(o) argument is that: "The timing of the Debtor's conversion of this non-exempt property [Troy Street Property] into an alleged homestead took place after the Debtor testified that she spoke with a bankruptcy attorney [in March 2024]. . . ."[99]  In other words, Mr. Nasious is claiming that the Debtor's move into the Troy Street Property in early May 2024 somehow was a disposition of the Troy Street Property.  But, recall the statutory text.  Section 522(o) depends on the Debtor "dispos[ing] of property." *Presto,* 376 B.R. at 568 (quoting Section 522(o)(4): "the value of an interest in — real or personal property that the debtor . . . . claims as a homestead; shall be reduced to the extent that such value is attributable to any portion of *any property that the debtor disposed of . . . .).*

A debilitating hole in Mr. Nasious' Section 522(o) argument is that the Debtor's move into the Troy Street Property and subsequent residency there does not constitute a disposition of any property.  The Debtor moved into the Troy Street Property in early May 2024.  She did not dispose of the Troy Street Property.  Instead, her occupancy of the Troy Street Property as a residence automatically "created" a homestead exemption. COLO. REV. STAT. § 38-41-202(1).  ("The homestead exemptions described in section 38-41-201 shall be *deemed created* and may be claimed if the occupancy requirements of section 38-41-203 and the requirement of section 38-41-205 relating to the type of property which may be homesteaded are met.") (emphasis added).  The Debtor's occupation of the Troy Street Property as a home merely changed its legal classification from non-homestead to homestead property.  Section 522(o) plainly does not apply to such circumstances or anything else the Debtor did.

A key decision entered shortly after enactment of Section 522(o) demonstrates the point:  *In re Lyons*, 355 B.R. 387 (Bankr. D. Mass 2006).  In *Lyons*, a creditor argued that Section 522(o)(4) applied because the debtor "recorded his homestead" within the look-back period.  (Unlike in Colorado where the homestead is automatically created by occupancy of a homestead, Massachusetts law requires recordation of a homestead declaration.)  The *Lyons* court rejected the creditors' argument ruling:

> The plain language of Section 522(*o*) indicates that the debtor must have "disposed of" nonexempt property within 10 years of filing bankruptcy.  Here, the Debtor did not sell, or otherwise transfer, any property within that time period; he merely designated his Property as a homestead.  In the cases

---

[99]  Docket No. 165 at 33

interpreting this statutory provision, the debtors sold nonexempt, or partially exempt, assets such as cars, farm equipment, and agricultural land and applied the proceeds to their home mortgages. *See In re Agnew,* 2006 WL 3208564 at *2; *In re Lacounte,* 342 B.R. 809, 812–3 (Bankr. D. Mont. 2005); *In re Maronde,* 332 B.R. 593, 596–7 (Bankr. D. Minn. 2005). *The Court finds that recording a homestead, which is essentially taking advantage of an exemption available under state law, is not analogous to these types of transfers and is not within the meaning of Section 522(o).* *See In re Miller,* 113 B.R. 98, 104 (Bankr. D. Mass. 1990) (holding that recording a homestead is not a transfer under the Uniform Fraudulent Transfer Act).

*Id.* at 390 (emphasis added). The reasoning of *Lyons* has been characterized as "unassailable and comports with both the text and purpose of this provision [Section 522(o)." *In re Noonan*, 2014 WL 184776, at *4 (Bankr. D. Mass Jan. 15, 2014). Other decisions are in accord. *See Heartwood 4, LLC v. Tabor (In re Tabor)*, 2016 WL 1533362, at *3 (Bankr. S.D. Fla. Apr. 13, 2016) (court rejected creditor's Section 522(o) argument "that the Debtors disposed of their previously nonexempt fee interest in the House when they made the House their homestead" because designation as a homestead was not a disposition).

Because the automatic creation of the Debtor's homestead in the Troy Street Property (when the Debtor moved into the Troy Street Property as a residence) was not a disposition of property, Section 522(o) is not applicable. As a matter of judicial economy and efficiency, and because the nonapplicability of Section 522(o) is so plain, the Court refrains from delving into the intent to hinder, delay or defraud issues posed by Mr. Nasious since they are unnecessary to the Court's disposition.

### 4.    Exemption Conclusion.

For the foregoing reasons, the Court sustains the Debtor's Homestead Exemption Claim and overrules the Exemption Objections. The Debtor has a valid $250,000.00 homestead exemption in the Troy Street Property.

## B.    The Judicial Lien Dispute.

The Debtor filed the Judicial Lien Motion requesting that the Law Firm's Judicial Lien (in the amount of $74,041.97)[100] be avoided under Section 522(f).

### 1.    General Section 522(f) Framework.

---

[100]    The amount of the Judgment was $72,470.42 plus interest. As of the Petition Date, in her Schedule D, the Debtor calculated the Judicial Lien as $74,041.97 (which includes interest accrual). The Court uses the higher figure.

Under Section 522(f), a debtor may avoid the fixing of certain liens on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled.  Section 522(f) states, in relevant part:

> (1)     . . . the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is —
>
> > (A)     a judicial lien . . . .
>
> (2)     (A)     For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of —
>
> > (i)      the lien;
> > (ii)     all other liens on the property; and
> > (iii)    the amount of the exemption that the debtor could claim if there were no liens on the property;
>
> exceeds the value that the debtor's interest in the property would have in the absence of any liens . . . .

To simplify, "two requirements must be met before a debtor can avoid a lien under § 522(f): (1) the debtor must have had an ownership interest in the property before the lien attached; and (2) avoidance of the lien must entitle the debtor to a state or federal exemption." *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 680 (1st Cir. 1999).

### 2.    Legal Analysis.

With respect to the first requirement, factually, the Debtor purchased the Troy Street Property in 2008.  On March 5, 2024, the Divorce Court entered the Attorneys' Lien Order granting the Law Firm the Judgment against the Debtor in the amount of $72,470.42 together with interest at the rate of 18% per annum compounded annually.[101] The Law Firm recorded the Transcript of the Judgment with the Arapahoe County Clerk on April 12, 2024.[102]  The recording of the Transcript of Judgment created the Judicial Lien against the Troy Street Property.  *See* Section 101(36) ("the term 'judicial lien' means a lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding.").  Since the Debtor owned the Troy Street Property on April 12, 2024,[103] the Debtor has established the first Section 522(f) avoidance requirement.

---

[101]    HL Ex. 5.
[102]    HL Ex. 7.
[103]    The Debtor transferred the Troy Street Property to the Trust on November 14, 2023.  However, the Trust transferred the Troy Street Property back to the Debtor on March 11, 2024.  So, the Debtor owned the Troy Street Property as of the date the Law Firm filed the Judicial Lien.

The second requirement goes to impairment. To determine whether an exemption is impaired by a lien, Section 522(f)(2)(A) sets forth a simple math calculation: Add (1) the lien sought to be avoided, (2) all other unavoided liens on the property, and (3) the amount of the exemption the debtor could claim if there were no liens on the property. If the sum exceeds the value of the debtor's interest in the property (in the absence of any liens), the exemption is impaired. *Id*. If a debtor seeks to avoid more than one lien, a lien that has been avoided shall not be considered in making the calculation with respect to other liens. 11 U.S.C. § 522(f)(2)(B).

Applying the statutory calculation to the Judicial Lien sought to be avoided here results in the following analysis:

| | | |
|---|---|---|
| 1. | Judicial Lien To Be Avoided: | $  74,041.97 |
| 2. | All Other Liens Not To Be Avoided: | $290,513.47 |
| 3. | Homestead Exemption If No Liens: | $250,000.00 |
| | Total: | $614,555.44 |

Accepting the Debtor's uncontested valuation of the Troy Street Property as of the Petition Date ($450,000.00), the Judicial Lien is avoidable in full because it impairs the Debtor's valid Homestead Exemption Claim. (Given the math, there is no need for the Court to make a calculation of possible partial impairment. *See In re Pearson*, 428 B.R. 533, 542 (Bankr. D. Colo. 2010)).

In the Law Firm Response contesting the Judicial Lien Motion, the Law Firm mainly argued that the Troy Street Property was not the Debtor's residence as of the Petition Date so the Debtor is not entitled to a homestead exemption claim under COLO. REV. STAT. § 38-41-201(1)(a).[104] This is the same argument which the Court already addressed and rejected in connection with the Debtor's Homestead Exemption Claim. The Court decided that the Debtor has a valid $250,000.00 homestead exemption in the Troy Street Property. So, the Debtor's Homestead Exemption Claim must be considered in the Section 522(f) calculation.

The Law Firm presented no other legal argument contesting avoidance of the Judicial Lien under Section 522(f) either in the Law Firm Response or at the Trial. However, the Law Firm invited the Court to consider: "*In re Benlon,* 496 B.R. 605 (2013)."[105] The citation is a bit off. The Court infers that the Law Firm wants the Court to evaluate the application of *In re Benbow*, 496 B.R. 605 (Bankr. D. Colo. 2013) (Tallman, B.J.).

---

[104]    Docket No. 80 at 1 (the Troy Street Property "was not her [the Debtor's] residence"); *Id*. at 2 (the Law Firm "disputes that Debtor is entitled to even assert that she is entitled to a Homestead Exemption for a property that was and is not her residence.").
[105]    *Id*. at 2.

The Court concurs with the Law Firm that the facts in the *Benbow* case are very similar to this dispute.  In *Benbow*, a law firm ("Stoorman") represented the debtor ("Benbow") in a divorce case.  The Colorado state court entered permanent orders directing that real property (the "Grizzly Property") be sold with the resulting proceeds to be split 50-50 between Benbow and his wife.  Benbow was disappointed with the permanent orders; so, he did not pay Stoorman's attorneys' fees.  Stoorman filed an "Amended Notice of Claim of Attorney's Lien" asserting unpaid attorneys' fees.  Stoorman requested and received a judgment from the state court in the amount of $71,513.24 against Benbow secured by "all the monies, properties, choses in action, claims and demands in suit, upon any property awarded" to Benbow.  *Id.* at 608.  Stoorman recorded a transcript of the judgment in the real property records thus perfecting a judgment lien against the Grizzly Property.  *Id,* at 608-09.  Afterward, Benbow filed for bankruptcy protection and claimed a homestead exemption in the Grizzly Property.  Benbow asked the bankruptcy court to avoid Stoorman's judgment lien under Section 522(f).

Again, the foregoing facts are strikingly similar to this dispute.  With respect to Section 522(f), the bankruptcy court determined that Stoorman's judgment lien qualified as a "judicial lien" under Section 101(36) and therefore was "subject to a determination, under [Section] 522(f), whether it impairs [Benbow's] homestead exemption and may be either partially or fully avoided."  *Id.* at 612.  After conducting a mathematical calculation of the judgment lien, other liens, and the homestead exemption as compared to the value of the Grizzly Property, the bankruptcy court ruled:

> Because the total of the lien [of Stoorman]; all other liens on the property; and the amount of the Debtor's homestead exemption exceeds the value of the Debtor's interest in the [Grizzly Property] by more than the amount of Stoorman's judgment lien, the [judicial] lien is avoided in its entirety.

*Id.* at 614.   Thus, the *Benbow* decision strongly supports avoidance of the Law Firm's Judicial Lien under Section 522(f).  The Law Firm does not argue otherwise.

However, the *Benbow* case also addressed another issue which the parties have not squarely presented here.  Stoorman argued that *in addition to the judicial lien*, he held a separate and distinct statutory attorney's charging lien under COLO. REV. STAT. § 12-5-119 (the statute in effect when *Benbow* was handed down)[106] which he sought to have avoided under Section 522(f).  The bankruptcy court pondered "whether, under Colorado law, Stoorman's charging lien is subject to a homestead exemption . . ." and concluded that: "the Debtor [Benbow] may not claim any portion [of] the proceeds from the [Grizzly] Property to which Stoorman's charging lien attaches, as exempt property under the Colorado homestead exemption;" and "Stoorman's charging lien is a lien imposed by Colorado statute and not by judicial action . . . and is not an avoidable judicial lien under [Section] 522(f)."  *Id*. at 611-12.

---

[106]     Effective August 9, 2017, COLO. REV. STAT. § 13-93-114 superseded COLO. REV. STAT. § 12-5-119.

The Court turns back to what it has been asked to do in the Judicial Lien Motion. The Debtor did not request that the Court evaluate or avoid any charging lien which may be held by the Law Firm under COLO. REV. STAT. § 13-94-114 (formerly cited as COLO. REV. STAT. § 12-5-119).   Instead, in the Judicial Lien Motion, the Debtor requested that the Court avoid (pursuant to Section 522(f)) only the specific Judicial Lien held by the Law Firm: the Judicial Lien evidenced by the Judgment and the Transcript of the Judgment filed with the Arapahoe County Clerk on April 12, 2024 at Reception No. E4022120.   In the Law Firm Response, the Law Firm did not focus on any claim of a charging lien. Instead, it principally argued that the Debtor was not entitled to the Homestead Exemption Claim because she did not occupy the Troy Street Property as a residence.  The Court has already rejected that position.  But, in the Law Firm Response, the Law Firm cited *Benbow*, 496 B.R. 605 and stated "HLPC's Attorney's Lien is no different than that of Mr. Stoorman in the *Benlon* Case . . . ."  Then, the Law Firm made a single reference to the Law Firm's "Statutory Charging Lien" in the last sentence of the Law Firm Response.[107] The Debtor did not reply to the Law Firm Response.  And, the charging lien topic was not squarely presented to the Court at the Trial either.  The Court also observes that the Law Firm filed Proof of Claim 20-1 on August 21, 2025.  In such Proof of Claim, the Law Firm alleged a debt of $62,418.50 and did not assert that the debt was "secured."  Although the Law Firm asserted that the basis of its claim was for "Legal representation performed for Ms. Belegratis in 22DR30041," it did not explicitly assert any type of attorneys' charging lien under COLO. REV. STAT. § 12-5-119.

Given the foregoing, and since the charging lien issue has not been properly presented to the Court and briefed, the Court limits its decision only to what was requested in the Judicial Lien Motion: avoidance of the specific Judicial Lien.  The Court grants the relief requested by the Debtor under Section 522(f).  However, the Court makes no determination about the possible existence of a charging lien held by the Law Firm.  To be clear, the Court does not decide: whether any such possible charging lien is a judicial lien under Sections 101(36) and 522(f); whether any such possible charging lien has merged into the Judicial Lien; whether the Law Firm may have waived any such possible charging lien; or the priority, if any, which such a charging lien may hold in relation to the Debtor's claim of homestead exemption in the Troy Street Property.

## **VI.   Final Conclusion.**

For the reasons set forth above, the Court:

SUSTAINS the Debtor's Homestead Exemption Claim and overrules the Final Nasious Exemption Objection, Law Firm Exemption Objection, and Trustee Exemption Objection.  The Debtor has a valid $250,000.00 homestead exemption in the Troy Street Property; and

GRANTS the Debtor's Judicial Lien Motion.  The Law Firm's Judicial Lien as evidenced by the Judgment and the Transcript of the Judgment filed with the Arapahoe

---

[107]     Docket No. 80 at 2-3.

County Clerk on April 12, 2024 at Reception No. E4022120 is AVOIDED.  The Court makes no ruling with respect to any possible attorneys' charging lien which may be held by the Law Firm.

DATED this 6th day of February, 2026.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge